NJM:NCG/LRO
F. #2022R00970

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

HOSSEIN AKBARI,
     also known as "Danial Yousef" and
     "Danial White,"
REZA AMIDI,
     also known as "Ali Rahmani," and
RAH ROSHD COMPANY,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

C O M P L A I N T   A N D
A F F I D A V I T   I N   S U P P O R T
O F   A R R E S T   W A R R A N T S

(18 U.S.C. §§ 1956(h), 2339B(a)(1) and
3551 et seq.; 50 U.S.C. §§ 1705(a), 1705(c))

Case No. 25-MJ-114

EASTERN DISTRICT OF NEW YORK, SS:

        COLIN JACOBSEN, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

     <u>Conspiracy to Violate the International Emergency Economic Powers Act and the Iranian
Transactions and Sanctions Regulations</u>

        In or about and between January 2020 and the present, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants HOSSEIN AKBARI, also known as "Danial Yousef" and "Danial White," REZA

AMIDI, also known as "Ali Rahmani," and RAH ROSHD COMPANY ("RAH ROSHD"),

together with others, did knowingly and intentionally conspire to violate the International

Emergency Economic Powers Act ("IEEPA"), contrary to Title 50, United States Code, Section

1705, and Title 31, Code of Federal Regulations, Sections 560.203, 560.204 and 560.205.

It was a part and an object of the conspiracy that the defendants HOSSEIN AKBARI, also known as "Danial Yousef" and "Danial White," REZA AMIDI, also known as "Ali Rahmani," and RAH ROSHD COMPANY, together with others, knowingly and willfully violated IEEPA, and the orders issued and regulations promulgated thereunder, to wit: AKBARI, AMIDI, RAH ROSHD and their co-conspirators willfully exported, reexported, sold and supplied, and caused to be exported, reexported, sold and supplied, directly and indirectly, goods, technology, and services from the United States, and by U.S. persons, wherever located, to Iran and to the Government of Iran, without first obtaining the required approval from the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), contrary to Title 50, United States Code, Section 1705 and Title 31, Code of Federal Regulations, Sections 560.203, 560.204 and 560.205.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Section 3551 et seq.)

Conspiracy to Provide Material Support to a Foreign Terrorist Organization

In or around and between January 2020 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HOSSEIN AKBARI, also known as "Danial Yousef" and "Danial White," REZA AMIDI, also known as "Ali Rahmani," and RAH ROSHD COMPANY, together with others, did knowingly and intentionally conspire to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including property and services, to a foreign terrorist organization, to wit: the Islamic Revolutionary Guard Corps ("IRGC"),[1] which at all

---

[1] The IRGC is also known as, and includes, Islamic Revolutionary Guards Corps; Islamic Revolution Guards Corps; Iran's Revolutionary Guard Corps; Islamic Revolutionary

relevant times was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, knowing that the IRGC was a designated foreign terrorist organization and that the IRGC was engaged in and was engaging in terrorist activity and terrorism, and the offense occurred in part within the United States and occurred in and affected interstate and foreign commerce.

(Title 18, United States Code, Section 2339B(a)(1) and 3551 et seq.)

<u>Money Laundering Conspiracy</u>

In or about and between January 2020 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HOSSEIN AKBARI, also known as "Danial Yousef" and "Danial White," REZA AMIDI, also known as "Ali Rahmani," and RAH ROSHD COMPANY, together with others, did knowingly and intentionally conspire: to conduct one or more financial transactions in and

---

Corps; IRGC; The Iranian Revolutionary Guards; Islamic Revolutionary Guards; Iran's Revolutionary Guards; Revolutionary Guards; Revolutionary Guard; Army of the Guardians of the Islamic Revolution; The Army of the Guardians of the Islamic Revolution; AGIR; Pasdaran; Pasdaran-e Inqilab; Pasdarn-e Enghelab-e Islami; Sepah; Sepah Pasdaran; Sepah-e Pasdaran-e Enghelab-e Eslami; Sepah-e Pasdaran Enghelab Islami; Islamic Revolutionary Guard Corps-Qods Force; IRGC-Quds Force; IRGC-QF; Qods Force; Sepah-e Qods; Jerusalem Force; Al Qods; Islamic Revolutionary Guard Corps (IRGC)-Qods Force; Pasdaran-e Enghelab-e Islami (Pasdaran); Sepah-e Qods (Jerusalem Force); Qods (Jerusalem) Force of the IRGC; Quds Force; IRGC Ground Forces; Islamic Revolution Guards Corps Ground Force; Basij; Baseej; Basij-e Melli; Islamic Revolution Guards Corps Resistance Force; Basij Resistance Forces; Mobilization of the Oppressed; Mobilization of the Oppressed Unit; Mobilization of the Oppressed Organization; Organization of the Mobilisation of the Oppressed; Sazman Basij Melli; Sazman-e Moghavemat-e Basij; Sazeman-e Basij-e Mostazafan; Vahed-e Basij-e Mostazafeen; Vahed-e Basij Mostaza'feen; National Mobilization Organization; National Resistance Mobilization; Resistance Mobilization Force; Nirooye Moghavemate Basij; Niruyeh Moghavemat Basij; IRGC Air Force; Islamic Revolution Guards Corps Air Force; Islamic Revolutionary Guards Corps Air Force; Islamic Revolutionary Guard Corps Air Force; IRGCAF; Sepah Pasdaran Air Force; Air Force, IRGC (Pasdaran); Islamic Revolutionary Guards Corps Aerospace Force; Aerospace Force of the Army of the Guardians of the Islamic Revolution; AFAGIR; Aerospace Division of IRGC; IRGC Aerospace Force; IRGCASF; IRGC Navy; Islamic Revolution Guards Corps Naval Force.

affecting interstate and foreign commerce, to wit: the transfer of funds from bank accounts held in the names of shell corporations to pay for parts for the operation of unmanned aerial vehicles ("UAVs" or "drones") purchased by RAH ROSHD, which transactions in fact involved the proceeds of specified unlawful activity, to wit: conspiracy to violate IEEPA and conspiracy to provide material support to a terrorist organization, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity and (a) with the intent to promote the carrying on of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i); and (b) knowing that the financial transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h) and 3551 <u>et</u> <u>seq</u>.)

The source of your deponent's information and the grounds for his belief are as follows[2]:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and am currently assigned to the New York field office.   I have been a Special Agent with the FBI since October 2019 and am responsible for conducting and assisting in national security investigations, including counterproliferation and counterterrorism investigations and investigations of export violations, including illicit finance and procurement.   Based on my training and experience, I have become knowledgeable about criminal activity, particularly violations of federal statutes regarding crimes that threaten the national security of the United

---

[2]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

States.   I have been personally involved in the investigation of this matter.

2.      This affidavit is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement officers, and my training and experience.   Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts obtained during the course of the investigation.   Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.   In addition, many of the statements described herein are based on draft English translations of documents that were not originally made in English and are subject to revision.

I.      LEGAL BACKGROUND

A.   Iranian Sanctions Under the Iranian Transactions and Sanctions Regulations

3.      IEEPA, 50 U.S.C. §§ 1701-1706, authorizes the President of the United States to impose economic sanctions on people, companies, and foreign countries in response to an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran and the Government of Iran within the United States or by U.S. persons, including transactions involving U.S.-origin goods.

4.      Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

5.      On March 15 and May 6, 1995, the President issued Executive Orders 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a U.S. person, wherever located, and on August 19, 1997, issued Executive Order 13059 clarifying the previous orders.   These Executive Orders, which remained in effect at all times relevant to the conduct described herein, authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.   Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.   See 31 C.F.R. Part 560.

6.      Title 31, Code of Federal Regulations, Section 560.204 of the ITSR prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale, or supply of goods, technology, or services to a third country knowing that such goods, technology, or services are intended for Iran or the Government of Iran, without a license from the U.S. Department of Treasury's OFAC.   Section 560.205 of ITSR prohibits the reexportation from a third country by a non-U.S. person of any goods, technology, or services that have been exported from the United States, knowing that such goods, technology, or services are intended for Iran, without a license from OFAC.

7.      The ITSR further prohibit transactions that evade, have the purpose of evading, cause a violation of, or attempt to violate the ITSR.   See 31 C.F.R. § 560.203.

B.  The IRGC Foreign Terrorist Organization ("FTO") Designation

8.    The IRGC is an Iranian military and counterintelligence organization under the authority of the Supreme Leader of Iran.   The IRGC plays a key role in Iran's development of ballistic missiles and in Iran's support for international terrorism and foreign terrorist organizations and exercises significant control and influence over the Iranian economy. The IRGC was designated by OFAC on or about October 25, 2007, as a Specially Designated National ("SDN") under Executive Order 13382, relating to the proliferation of weapons of mass destruction ("WMDs"), for its role in supporting the proliferation of ballistic missiles capable of carrying WMDs and procuring equipment that could be used to support the Government of Iran's ballistic missile and nuclear weapons programs.

9.    The IRGC was further designated on or about October 13, 2017, by OFAC as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224, relating to global terrorism, for its role in supporting the terrorist activities of the IRGC's Qods Force ("IRGC-QF").   The IRGC-QF was designated by OFAC as an SDN under Executive Order 13224 on or about October 25, 2007, for its role as the Government of Iran's primary arm for executing the Government of Iran's policy of supporting terrorist and insurgent groups, including Hizballah, Hamas, and the Taliban, and insurgent forces in Iraq.

10.    On or about April 15, 2019, the U.S. Department of State designated the IRGC as an FTO under Section 219 of the Immigration and Nationality Act for the IRGC's direct involvement in terrorist plotting, support for terrorism, and hostage-taking.

11.    Among its activities hostile to the United States and its allies, the IRGC has actively targeted nationals of the United States and its allies living around the world for kidnapping and/or execution, both to repress and silence dissidents critical of the Iranian regime

and to take vengeance for the death of Qasem Soleimani, who was killed by a U.S. drone strike in Baghdad on or about January 3, 2020.

12. Additionally, the IRGC is engaged in terrorist activity as it provides material support to other FTOs, including Hamas, Hizballah, and others.

II. THE DEFENDANTS AND RELEVANT ENTITIES

13. AKBARI is a 63-year-old Iranian national who is believed to reside in Iran. AKBARI is the Chief Executive Officer ("CEO") and Managing Director of RAH ROSHD COMPANY.

14. AMIDI is a 62-year-old Iranian national who is believed to reside in Iran. AMIDI was previously the Commercial Manager of Qods Aviation Industries ("QAI"), an Iranian state-owned aerospace company. AMIDI is currently the Commercial Manager of RAH ROSHD COMPANY. On or about December 12, 2013, pursuant to Executive Order 13382, OFAC designated QAI (including its aliases "Ghods Aviation Industries" and "Qods Research Center") and AMIDI as SDNs for evading international sanctions against Iran and for providing support for Iran's nuclear program. At that time, the U.S. Department of the Treasury announced that the IRGC operated QAI and that QAI was involved in the production of UAVs, parachutes, para-gliders, and paramotors, which the IRGC has used.

15. RAH ROSHD is a company based in Iran. RAH ROSHD procures and supplies advanced electronic, electro-optical, and security systems to the Government of Iran and designs, builds, and manufactures ground support systems for UAVs. RAH ROSHD's clients include the IRGC, QAI, Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"),[3]

---

[3] On or about March 26, 2019, pursuant to Executive Order 13224, OFAC designated MODAFL as an SDN for its role in assisting the IRGC.

Shahed Aviation Industries Research Center ("SAIRC"),[4] and Shahid Bakeri Industrial Group ("SBIG").[5]

III.    SUMMARY OF THE CRIMINAL SCHEME

16.    An investigation conducted by the FBI has revealed that the defendants conspired to unlawfully obtain U.S.-origin parts needed to manufacture UAVs for military use in Iran, including a UAV known as the "Mohajer-6" manufactured by QAI.   At least one of those parts was manufactured by a Brooklyn, New York-based company ("Company-1").   Under IEEPA and the ITSR, it was unlawful to cause U.S. manufacturers like Company-1 to send their products, including drone parts, to Iran absent approval from OFAC.   To facilitate this scheme and evade the U.S. sanctions imposed on Iran and the Government of Iran, AMIDI and AKBARI falsely purported to represent companies other than RAH ROSHD, including a company based in the United Arab Emirates ("Company-2") and a company based in Belgium ("Company-3"). The defendants also used various "front" or "shell" companies to pay for UAV parts and parts to operate UAVs and to obfuscate that Iran was the true end destination and the true identities of the sanctioned end users, including QAI and the IRGC, which were acquiring U.S.-made parts through RAH ROSHD.

17.    In addition to conspiring to violate IEEPA, the defendants conspired to provide material support to the IRGC by providing goods and services to the IRGC, including constructing military shelters, providing cameras and drone field hangers, and conspiring to

---

[4]      On or about November 15, 2022, pursuant to Executive Order 13382, OFAC designated SAIRC as an SDN in connection with its design and production of the Shahed-series UAVs used by Russian forces in Ukraine.

[5]      On or about June 29, 2005, pursuant to Executive Order 13382, OFAC designated SBIG as an SDN because of its work for Iran's ballistic missile program.

procure drone parts as well as parts to operate drones, including servo motors, pneumatic masts, and engines, for the benefit of the IRGC's military campaign.

18.     Finally, the defendants conspired to commit money laundering. Specifically, the defendants used at least three shell companies to pay a China-based company that sent invoices to RAH ROSHD for the sale of motors.   Such payments were processed through U.S.-based correspondent bank accounts.   The defendants also used two of these shell companies to pay a separate China-based company for the sale of pneumatic masts.

IV.    <u>RUSSIA'S USE OF IRANIAN DRONES</u>

19.     On or about February 24, 2022, Russia invaded Ukraine using air strikes and ground forces.

20.     In or around September 2022, the Ukrainian Air Force shot down an Iranian-made Mohajer-6 drone used by the Russian military in Ukraine.   The Mohajer-6 drone recovered by the Ukrainian Air Force contained parts made by several U.S. companies, including electronic components manufactured by Company-1.

21.     On or about November 15, 2022, OFAC designated QAI pursuant to Executive Order 14024 due to its role in producing UAVs supplied to Russia.   This designation supplemented QAI's December 12, 2013 designation relating to efforts to evade sanctions against the Government of Iran.

22.     On or about January 6, 2023, pursuant to Executive Order 13382, OFAC added QAI's alias, "Light Airplanes Design and Manufacturing Industries," to QAI's SDN listing.   At that time, OFAC announced that QAI was responsible for the design and production of UAVs, including Mohajer-6 UAVs, that Iran transferred for use in Russia's war in Ukraine.

23.     As discussed further below, the defendants conspired to procure parts from Company-1 and other U.S. companies, and Company-1's parts were found in the Mohajer-6 UAV recovered by the Ukrainian Air Force.

V.     THE DEFENDANTS' ILLICIT PROCUREMENT SCHEME

24.     As described below, the defendants AMIDI and AKBARI used their company RAH ROSHD to conspire to procure U.S.-manufactured parts, including parts from Company-1, and caused those parts to be exported and reexported to Iran.   To evade the sanctions imposed on Iran, the defendants purported to represent companies based in countries other than Iran and used aliases to obfuscate their identities.

A.  The Defendants' Conspiracy to Procure Electronic Components Manufactured by Company-1 and Other U.S. Manufacturers

25.     In furtherance of the defendants' scheme to illicitly procure U.S.-made parts, the defendants agreed with each other and with others to procure the parts from the United States and export and reexport them to Iran.

26.     In connection with this agreement, between in or around January 2020 and February 2024, AMIDI frequently sent emails to AKBARI requesting that AKBARI provide price quotations for electronic parts that AMIDI specified (including by manufacturer and quantity) so that AMIDI could send those prices to the defendants' customers.   AKBARI, using the aliases "Danial Yousef" and "Danial White," then requested quotations for such parts from supplier companies based in China, the United Arab Emirates, and Germany, among other countries, and forwarded those companies' prices to AMIDI.

27.     On or about May 30, 2020, AMIDI emailed a potential customer attaching a company catalog for RAH ROSHD.   In the email exchange, AMIDI represented that RAH ROSHD had "strong supplying sources and offices in Europe[,] Dubai and far east to provide

and ship your orders from overseas," further showing that the defendants used supplier companies based in the United Arab Emirates, Europe, and China from which to procure and ship parts to its customers.   The catalog attached to AMIDI's email contained pictures of parachutes, cables, and electronic parts alongside the names of U.S.-based manufacturers.   The catalog, which was originally in Farsi, stated that RAH ROSHD provided items, including cables, mechanical, hydraulic, and pneumatic parts, from "major companies all over the world" and "reputable international companies in the field of automation."

28.     Additionally, as part of this scheme, AKBARI pretended to be affiliated with Company-2, using a "spoofed" email address that contained a misspelled version of Company-2's name.   Between in or around September 2020 and December 2023, AMIDI exchanged multiple emails with AKBARI at the spoofed email address requesting quotations from AKBARI for circular connectors, cables, batteries, steel pipes, and rods, including items manufactured by U.S. companies.

29.     In turn, AKBARI used the spoofed Company-2 email address to procure additional parts, including parts manufactured by Company-1.   For instance, in or about June 2022, AKBARI used the spoofed Company-2 email address to communicate with a sales representative of a Chinese company regarding parts manufactured by Company-1.   After receiving a quotation for quantities of multiple Company-1 parts, AKBARI, using the spoofed email address, responded: "Thank you, I will let you know."

30.     Similarly, in or about April 2023, AKBARI used the spoofed Company-2 email address to communicate with a representative of another Chinese company to request pricing of various electronic parts manufactured by Company-1, including a particular limiter

manufactured by Company-1 (the "Limiter").[6]   As discussed further below, the Limiter

manufactured by Company-1 was found inside the Mohajer-6 UAV used by the Russian military

and shot down by the Ukrainian Air Force.

31.    In addition, between in or around November 2022 through January 2024,

AMIDI possessed documents and photographs depicting apparent procurement lists of U.S.-

manufactured items, including items manufactured by Company-1.

32.    For example, three of the lists in AMIDI's possession in or about and

between November 22, 2022, and January 1, 2024, listed details on the Limiter manufactured by

Company-1, including the part number of the Limiter and another part manufactured by

Company-1, in the quantity of 100 units.   One of those lists contained pricing of the Limiter and

another part manufactured by Company-1 in the amount of 190 RMB (renminbi, the official

currency of the People's Republic of China), indicating that AMIDI was procuring the Limiter

through a Chinese company, or through a company using Chinese currency.

B.    The Defendants' Conspiracy to Procure U.S. Parts to Support Manufacturing of Iranian
      UAVs

33.    The defendants conspired to procure U.S.-origin parts to support the

manufacturing of drones and parts used to operate drones for RAH ROSHD's clients, including

QAI, IRGC, SAIRC, and MODAFL.

34.    In or around November 2020 and June 2021, AMIDI forwarded a

document named "UAV Parts List" which contained what was titled a "LIST OF UAV

SUBSYSTEMS."   The document included "body and fus[e]lage," "mechanical parts,"

"electronic parts," "ground station," "payload," and "parachute," which, based on my experience

---

[6]    The Limiter protects against damage from unwanted signals over a wide
frequency range.

and the investigation, are the various systems of a UAV and systems used to operate a UAV. Within each category, the document contained specific parts, such as engine, steel alloy, connector, cable, spectrum analyzer, parachute fabric, and lighting. The document included a list of manufacturers for certain parts, including numerous U.S.-based manufacturers.

35.    In or around July 2020, AMIDI sent an Excel spreadsheet titled "Commercial Projects Report," that listed projects only for RAH ROSHD's customer "Ghods." Based on my training and experience, I am aware that "Ghods Aviation Industries" is an alias for QAI (or Qods Aviation Industries), and that "Ghods" is an abbreviation for QAI. Thus, this document refers to the customer QAI. The report included acquiring wires and cables, motors, monitors, and steel tubes and rods for QAI. The document reflected that RAH ROSHD was procuring these items on behalf of QAI and that all the listed items had been delivered or were in the process of being shipped.

36.    In or around May 2022, AMIDI possessed a brochure for RAH ROSHD providing details regarding the company, its clients, and its projects (the "RAH ROSHD Brochure"), which was originally written in Farsi. In relevant part, the RAH ROSHD Brochure listed that RAH ROSHD was involved in the design, manufacture, and production of ground support systems for UAVs, and listed that some of its most important completed projects were for IRGC, QAI, SAIRC, SBIG, and MODAFL, among others. RAH ROSHD's most significant projects for QAI, which was listed as one of RAH ROSHD's most important clients according to the RAH ROSHD Brochure, included construction and production of pan tilt motors and providing pneumatic masts.

37.    In or around April 2022, AMIDI possessed another Excel spreadsheet titled "Current Commercial Projects Report," which listed projects for RAH ROSHD's

customers, including "Ghods," or QAI.   This document listed current projects for QAI, including acquiring connectors, wires and cables, steel alloys, circuit breakers, electronic components, parachute fabric, and spectrum analyzers, many of the same parts referenced in the "List of UAV Subsystems" document referenced above.   The report noted the quantity of the items sold to QAI; the manufacturer; RAH ROSHD's purchase price; the amount RAH ROSHD had paid in U.S. dollars on behalf of QAI; and the status of the order, which was listed in Farsi, indicating that some of the goods had already been shipped to QAI.   The manufacturers included U.S.-based manufacturers.   The document indicated that RAH ROSHD was procuring parts on behalf of its customers QAI, SAIRC, SBIG, and others for an approximate value of over $1.5 million.

      38.     Based on the above evidence, and the investigation to date, there is probable cause to believe that the defendants conspired to procure U.S.-made parts to assist in the design, production, and manufacturing of drones, and that the defendants were providing drone equipment to the Government of Iran.

C.  U.S.-Made Parts Inside the Mohajer-6 Drone

      39.     In or around September 2022, the Ukrainian Air Force shot down an Iranian-made Mohajer-6 drone used by the Russian military in Ukraine and recovered the drone. The drone was subsequently analyzed by a third-party research organization to determine the origin of the electronic parts found inside of it.   The analysis identified that the Limiter manufactured by Company-1 was inside the Mohajer-6 drone.

      40.     According to an open-source video posted in or around February 2022, IRGC officials showcased the operational capabilities of a Mohajer-6 drone.   In this video, which I have reviewed, a truck labeled with the IRGC's name and logo appeared to facilitate communications with the Mohajer-6 drone assisted by what appears to be a pneumatic mast.   In

the video, the Mohajer-6 drone was also labeled with the IRGC's logo.   Photographs from this
video appear below:







D.  <u>The Defendants' Knowledge of Iranian Sanctions and U.S. Export Controls</u>

41.    Throughout the course of the conspiracy, AKBARI and AMIDI

demonstrated their awareness of Iranian sanctions and their knowledge that their conduct was

unlawful.   As reflected in the information provided below, AKBARI and AMIDI engaged in

conduct—including using front companies to make payments on behalf of RAH ROSHD, using

multiple aliases to obfuscate their true identities, and posing as representatives of other

companies—that demonstrate their efforts to disguise their identities, evade law enforcement,

and intentionally violate and evade U.S. sanctions and export control laws.   Additionally,

AKBARI and AMIDI made statements or received communications from others showing that

they knowingly engaged in this criminal activity.

42.    For example, on or about and between August 4, 2020, and August 12,

2020, AMIDI, using the alias "Ali Rahmani," requested a refund from a company based in China

("Company-4") from which AMIDI and AKBARI had ordered goods.   In coordinating about the

refund, AMIDI provided the name of a Chinese bank and an account number to which money

should be refunded with the beneficiary name "Zhao Renbo."   An employee from Company-4

responded that the payor was not "Zhao Renbo" and Company-4 needed a bank account that

matched the payor.   AMIDI responded: "As you know we are not able to transfer money from

Iran directly because of sanctions against Iranian banks.   So we have to transfer money via

Exchange brokers in Iran and we do not know the account holder who made the final payment

to your company account.   It is the usual method which all transactions to Chinese companies

made from Iranian merchants or Iranian persons and it is working for many years.   You

definitely know this method of payment between Iran and China."   The employee from

Company-4 responded that this would be the "first time" the company would be making a

payment in this way and that their "team is worried."   AMIDI responded, "I am sure that you

and managers of your company aware of the situation of business with Iran at present time and

sanctions from USA and western countries against Iran.   You know that banking transactions

from Iran or to Iran are banned from more than 10 years ago. Iran and China have more than 12 Billion Dollars business together per year and Commercial and financial relations and specially payments are being done via Exchange offices in Iran to the banks in China.   This is not a strange or unusual payment term between two countries for a long time."   AKBARI was copied on these emails between AMIDI and the employee from Company-4, and he forwarded a draft letter titled "STATEMENT" to AMIDI's email account, which instructed Company-4 to pay "Zhao Renbo" at a beneficiary bank account.

43.     Additionally, on or about September 2, 2019, AMIDI visited a website with an article published by Radio Farda related to U.S. sanctions on two networks linked to the Iranian government and the IRGC.   The article, which was written in Farsi, stated in sum and substance and in part that the U.S. Department of Treasury announced that it had sanctioned a network that used a Hong Kong-based company to circumvent U.S. sanctions and attempted to purchase American technology and equipment and provide it to the Iranian government and the IRGC.   The article stated that another network delivered aluminum alloys for use in Iran's nuclear program to companies under the supervision of the Iranian Ministry of Defense.   The article further stated that the U.S. Department of Treasury announced that the United States government was doing its utmost to thwart Iran's sophisticated plots to acquire weapons of mass destruction and warned the international community to be wary of the Islamic Republic of Iran's coverups to exploit foreign companies.   AMIDI's access of an article describing U.S. sanctions against Iran, including government entities in Iran, shows his awareness of U.S. sanctions that prohibited acquisition of U.S. parts for use by the IRGC and MODAFL.

44.     As noted above, both AKBARI and AMIDI used aliases to obfuscate their conduct, and AKBARI pretended to be affiliated with Company-2 using a spoofed email address.

Also, as described below, the defendants used multiple front or shell companies to make payments on behalf of RAH ROSHD.

45.    Based on the investigation to date and the information described herein, there is probable cause to believe the defendants conspired to procure U.S. parts to support manufacturing of Iranian UAVs, including the Mohajer-6 UAV that was recovered by the Ukrainian Air Force.

E.    The Defendants Used Front Companies to Make Payments

46.    As detailed above and below, the defendants used front, or shell, companies to make payments on behalf of RAH ROSHD—due to, at least in part, the difficulty in gaining access to the international banking system from Iran in light of the effect of U.S. sanctions on U.S. dollar transactions involving counterparties in Iran.

47.    Specifically, the defendants used three front companies, Front Company-1, Front Company-2, and Front Company-3 (collectively, the "Front Companies"), which are all based in the United Arab Emirates, to pay invoices addressed to RAH ROSHD for the purchase of anti-lock braking system ("ABS") direct-current ("DC") motors from a company based in China ("Company-5") that the defendants then re-sold in Iran for the benefit of SBIG.

48.    As noted above, AMIDI possessed a report titled "Current Commercial Projects Report," which listed projects for RAH ROSHD's customers, including SBIG. Specifically, the report noted that 25,000 ABS motors manufactured by Company-5 were sold for $240,000.00 to SBIG.

49.    Between in or around August 2021 and January 2022, AMIDI communicated with a sales representative at Company-5 regarding the purchase of ABS DC motors for one of AMIDI's clients.    On or about January 19, 2022, AMIDI referred to an order for 25,000 pieces and stated that he "need[ed] 5000 pieces urgently."    The next day, AMIDI

possessed a pro forma invoice from Company-5 for the delivery of 5,000 DC motors to be delivered from Beijing, China to Tehran, Iran.   Subsequently, in or around February 2022 and March 2022, Front Company-2 sent two payments to Company-5 referencing the pro forma invoice.   Based largely on these facts, I believe Front Company-2 sent these payments to Company-5 on behalf of RAH ROSHD.

50.    On or about April 4, 2022, AMIDI possessed a letter on the letterhead of Company-3 that was addressed to "Shahid Bagheri Industries", or SBIG, in Iran with attention to their "Commercial Dept."   The letter included an invoice regarding 5,000 items of "ABS DC Motor" for a total price of $48,000.00.

51.    In or around May 2022, AMIDI possessed a letter from Company-5 authorizing RAH ROSHD to be a "qualified dealer" in Iran, responsible for the sales and after-sales service of DC motors in the region, between on or about and between January 1, 2022, and December 31, 2023.

52.    Between on or about February 28, 2022 and August 25, 2022, Company-5 received payments from the Front Companies through U.S.-dollar correspondent bank transactions processed through two U.S.-based banks.   The wires, invoices, and payment confirmations show that the payments were made on behalf of RAH ROSHD to Company-5 for ABS DC motors for delivery to SBIG.

53.    Based on my training and experience and my involvement with the investigation, AMIDI and AKBARI conspired to procure at least 25,000 ABS DC motors from Company-5 for the benefit of OFAC-designated SBIG.   In furtherance of this procurement, the defendants used Front Companies, which utilized the U.S. banking system to provide payments

to Company-5 on behalf of RAH ROSHD and to obfuscate that each of the defendants was based in Iran and was procuring items to Iran.

VI.    **THE DEFENDANTS' CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO THE IRGC, A DESIGNATED FOREIGN TERRORIST ORGANIZATION**

54.    From at least in or around May 2017, up to and including the present, the defendants conspired to provide drone parts to manufacture UAVs for RAH ROSHD's client, the IRGC, a designated FTO.   Similar to the sanctions evasion scheme referenced above, throughout the course of the conspiracy, AKBARI and AMIDI demonstrated their awareness that the IRGC is a designated foreign terrorist organization or is engaged in terrorist activity and terrorism.   As discussed above, AKBARI and AMIDI used front companies to make payments on behalf of RAH ROSHD, used multiple aliases to obfuscate their true identities, and posed as representatives from other companies that are indicative of attempts to disguise their identity, evade law enforcement, and intentionally violate U.S. laws.   In addition, AKBARI and AMIDI possessed documents, made statements, and accessed information regarding the IRGC showing that they knowingly engaged in this criminal activity.

55.    As noted above, AKBARI and AMIDI are the CEO and Commercial Manager, respectively, of RAH ROSHD.   RAH ROSHD has done business with the IRGC since at least in or around 2017.

56.    For example, on or about May 31, 2017, AKBARI received an email with attachments that depicted a signed letter from the "Drone Group Commander" of the IRGC Ground Forces regarding a test conducted on a gyroscope that was manufactured by RAH ROSHD.   The letterhead of the document included the IRGC seal, which I recognize based on my training and experience.   The letter, which was originally written in Farsi, stated that one of the tests conducted by the IRGC Ground Forces included installing the gyroscope manufactured

by RAH ROSHD on the Ababil-3 drone.   The letter reflected that it was sent to the Deputy for

Supply and Logistics of the IRGC Ground Forces with copy to AKBARI, the CEO of RAH

ROSHD.   Based on the investigation to date, I am aware that the Ababil-3 drone was

manufactured by the Iran Aircraft Manufacturing Industrial Company, also known as "HESA."

On or about September 17, 2008, OFAC designated HESA as an SDN under Executive Order

13382 for providing support to the IRGC.

57.     The IRGC was designated by the United States Secretary of State as an

FTO on April 15, 2019, pursuant to Section 219 of the Immigration and Nationality Act.   The

designation of the IRGC as an FTO was reported in numerous international media outlets,

including in Iran.

58.     AMIDI received several emails containing news regarding the IRGC

following its designation by the U.S. Secretary of State.   As described above, for example,

AMIDI accessed an article on September 2, 2019, regarding U.S. sanctions on two networks

linked to the Iranian government and the IRGC.   On or about June 5, 2022, AMIDI received an

email containing news headlines that stated, "A colonel from an elite unit of the terrorist IRGC

was killed in Tehran!"   Additionally, on or about July 26, 2023, AMIDI received a Google alert

for "Commanders-in-Chief of the Islamic Revolutionary Guard Corps" and on or about

December 31, 2023, AMIDI received a Google alert for the "Islamic Revolutionary Guard

Corps."   I believe this indicates that AMIDI was accessing news regarding the IRGC.

59.     After the designation of the IRGC as an FTO, RAH ROSHD continued to

do business with the IRGC, including by conspiring to procure parts for the Mohajer-6 drone for

the IRGC's and the Government of Iran's benefit.   Specifically, and as described below, RAH

ROSHD conspired to procure drone parts and parts used to operate drones, specifically, servo motors, pneumatic masts, and engines for the benefit of the IRGC.

     A.    The Defendants' Efforts to Procure Servo Motors for the Benefit of the IRGC

     60.    On or about July 3, 2020, AMIDI received a message containing a document in Farsi highlighting RAH ROSHD's work, which was titled "Company Introduction." The document, which was subsequently translated to English, stated that RAH ROSHD focuses on "[p]roduction engineering of specific aviation and telecommunication systems," "[p]roduction engineering of composite parts and bodies of aircrafts," including shelters, launchers, and masts, and "[c]onsultation and provision of various aircrafts and training courses." The document included photographs of a work appreciation letter from the IRGC, thanking RAH ROSHD for its work for the IRGC. On or about February 10, 2021, AMIDI sent this document to another individual.

     61.    Specifically, the letter was from IRGC's Aerospace Force, from approximately 2017 or 2018, and was signed by the head of UAV Command for IRGC's Aerospace Force. The letter, which was originally in Farsi and translated to English, included a quote from the Supreme Leader of Iran, Ali Khamenei, regarding the importance of self-sufficiency and domestic production to strengthen Iran's economy and "disappoint the enemies of the Islamic Republic." The letter praised the efforts of RAH ROSHD and its employees and their significant achievements in designing and manufacturing "servo motors" for defense equipment. The letter also noted continued efforts of RAH ROSHD "in strengthening the defensive capabilities of the Islamic Republic of Iran."

     62.    As noted above, in or around May 2022, AMIDI possessed the RAH ROSHD Brochure providing details regarding the company, its clients, and its projects. The RAH ROSHD Brochure listed, in part, that RAH ROSHD was involved in the design,

manufacture, and production of ground support systems for UAVs, and listed that some of its most important completed projects were for IRGC, QAI, SAIRC, and MODAFL, among others. The RAH ROSHD Brochure also referenced contracts that RAH ROSHD had with QAI regarding the construction and production of pan tilt motors and providing pneumatic masts and with IRGC's Ground Forces Deputy for Supply and Logistics regarding phase one cameras and accessories, construction of military shelters, and a drone field hanger. The RAH ROSHD Brochure also listed as a client "Ground Forces Drones." Based on my training and experience, and my involvement with the investigation, I believe "Ground Forces Drones" refers to drones for the IRGC's Ground Forces. The RAH ROSHD Brochure noted that projects completed for the "Ground Forces Drones" included construction and production of drone re-fuelers and sale of parachutes.

63. Additionally, the RAH ROSHD Brochure attached the same work appreciation letter discussed above addressed to RAH ROSHD and AKBARI from IRGC's Aerospace Force. The letter thanked RAH ROSHD for its work on behalf of Iran.

64. The RAH ROSHD Brochure included a description of servo motors, including specific models, and noted that servo motors "have a wide application in robotic and industrial production industries such as motors of aircraft flight control surfaces." The RAH ROSHD Brochure also stated that "Rah Roshd Company has succeeded in manufacturing both of these Servo Motors," referring to specific models.

65. The RAH ROSHD Brochure stated that its most important clients for servo motors included "Ground Forces Drones," which as noted above, I believe refers to the IRGC Ground Forces, and QAI. Specifically, the RAH ROSHD Brochure listed that RAH

ROSHD had two contracts with the "Ground Forces Drones" with respect to servo motors and one contract with QAI with respect to servo motors.

66.    On or about December 7, 2020, AMIDI received a pro forma invoice addressed to AMIDI that listed a quantity of 100 servo motors for a total cost of €69,500.00 for delivery to Iran, indicating that AMIDI intended to purchase 100 servo motors.

67.    On or about May 26, 2022, AKBARI possessed a payment ledger that included several payments authorized by "Mr. Hossein," which I believe refers to AKBARI. One of the rows indicated that a payment of $20,000.00 had been made for servo motors, and that a total of $19,720.00 remained to be paid.

68.    As described above, RAH ROSHD's "Commercial Projects Report" reflected that RAH ROSHD was procuring drone parts (and other parts to operate drones) on behalf of QAI.   The report specifically listed that 200 servo motors were being shipped.

69.    I am aware that the Mohajer-6 drone, which was recovered by the Ukrainian Air Force and subsequently analyzed, contained a servo motor produced by the same manufacturer and with the same model name that AMIDI appeared to purchase as described above.

B.    The Defendants' Efforts to Procure Pneumatic Masts for the Benefit of the IRGC

70.    In addition to conspiring to procure servo motors for the IRGC's benefit, the defendants also conspired to procure pneumatic masts.[7]   As noted above, the RAH ROSHD Brochure stated that RAH ROSHD's most significant completed projects included providing pneumatic masts for QAI.

---

[7]    Based on the investigation, I understand that pneumatic masts are an important component of the operation of the Mohajer-6, although the masts are not a part of the drone itself.

71.     Email correspondence shows the defendants' efforts to evade U.S. laws to purchase pneumatic masts for QAI's and, ultimately, the IRGC's benefit.   Starting on or about May 2, 2020, AKBARI emailed with a sales representative at a China-based company ("the Sales Representative") regarding efforts to procure 60 pneumatic masts for approximately $60,800.00 to be delivered to Iran.   The company at which the Sales Representative worked, according to its website, focused on the production and export of pneumatic telescopic masts, including in military applications such as UAV tracking or detection.   On or about May 13, 2020, the Sales Representative responded, "we can't get payment from Iran, also we can't send parts to Iran, so except you pay in other country(such as UAE), and deal with delivery by yourselves, we can't do this business with you."   AKBARI responded that "all shipment is through Dubai" and asked for payment in RMB, because the payment would occur in China. The Sales Representative ultimately agreed.   On or about December 23, 2020, the Sales Representative confirmed receipt of payment from AKBARI and advised he would arrange to produce the masts.   On or about December 25, 2020, AKBARI requested a mast sample from the Sales Representative and indicated he was in communication with his "customer."

72.     On or about January 28, 2021, AKBARI requested that the Sales Representative arrange a shipment of masts, and the Sales Representative asked AKBARI for payment.   The Sales Representative suggested ways that the masts could be delivered to Dubai and that AKBARI could "deal with delivery by yourselves" from Dubai.   Throughout April 2021, AKBARI communicated with the Sales Representative regarding the shipment of masts for delivery to Iran, which I believe refers to the same shipment referenced above.   On or about April 6, 2021, the Sales Representative forwarded a bill of lading, and AKBARI confirmed receipt.

73.     On or about April 6, 2021, AMIDI sent a letter to an unknown recipient on letterhead for Company-3 addressed to "Tejarat Payedar Ofogh Co. Iran."   The letter detailed an invoice, No. 5211/2-1457, regarding the purchase of 60 pneumatic masts for a total price of $103,000.00 to be shipped to Bandar Abbas, Iran.   On or about May 10, 2021, AMIDI received a packing list document, dated February 8, 2021, that detailed the delivery of 60 masts in three packages.   The packing list provided contact details for "Tejarat Payedar Ofogh Co."   After February 2021, three packages containing 60 pneumatic masts were shipped from China to "Tejarat Payedar Ofogh Co."[8] in Iran.   Based on the invoice, bill of lading, and the above-referenced correspondence between AKBARI and the Sales Representative regarding the purchase and shipment of 60 pneumatic masts, I believe that AKBARI purchased 60 pneumatic masts from the Sales Representative for delivery to "Tejarat Payedar Ofogh Co."   I further believe that AMIDI and AKBARI used the letterhead of Company-3 to obfuscate their identities in connection with this series of transactions.

74.     In or around June 2022, AKBARI re-initiated contact with the Sales Representative to inquire about the cost of masts.   In response, the Sales Representative provided a quotation for RAH ROSHD to buy masts at a cost of 332,990.00 RMB.   On or about August 16, 2022, following a series of emails, the Sales Representative provided a pro forma invoice for RAH ROSHD for the sale of 44 masts.   On or about August 18, 2022, the Sales Representative provided an updated invoice reflecting a higher price if delivery was to "CIF ABBAS."   Based on my training and experience and my involvement in this investigation, "CIF ABBAS" reflects a delivery of the masts to Bandar Abbas, Iran.   AKBARI stated, "as before[,]

---

[8]     On or about October 18, 2023, OFAC designated Saberin Kish Company, also known as "Tejarat Payedar Ofogh," pursuant to Executive Order 13382, for being owned or controlled by, or acting or purporting to act for or on behalf of the IRGC.

please mention cif Dubai or Bandar Abbas[.] [T]he money will be transferred from Dubai or inside china."   I believe "cif" refers to cost, insurance, and freight (CIF), an international shipping agreement which represents the charges paid by a seller to cover the costs, insurance, and freight of a buyer's order while the cargo is in transit.   In response, the Sales Representative provided an updated invoice reflecting a higher price.

75.    On or about August 21, 2022, the Sales Representative confirmed receipt of payment from AKBARI to initiate the production of the masts.   The next day the Sales Representative alerted AKBARI that the paid money was "controlled by Chinese police" and asked AKBARI to resolve the issue.   On or about August 29, 2022, the Sales Representative confirmed that the problem had been resolved and that the production "is going on."

76.    On or about September 21, 2022, AKBARI requested that the Sales Representative attach the logo of RAH ROSHD to the masts "as before" and on the same day followed up indicating the masts would go "directly to the customer place."   The Sales Representative responded "no" to the request stating, "if it is checked by customs, all masts will be detained."

77.    On or about September 22, 2022, in reference to the procurement of the masts, AKBARI asked the Sales Representative to send a U.S. dollar account and a new pro forma invoice, which the Sales Representative provided.   On or about September 23, 2022, the Sales Representative provided AKBARI information for a Chinese company that could receive payments related to the masts in U.S. dollars ("Company-6") and attached a quotation regarding the delivery of 44 masts to Bandar Abbas, Iran.

78.    On or about September 24, 2022, AKBARI asked the Sales Representative to confirm the receipt of payment and attached a PDF document labeled "mast remain paid

34404 $ 140171" detailing a transaction receipt from Dubai Islamic Bank. The document
indicated that Front Company-1 had sent a payment of $34,403.00 to Company-6's account
referenced above, which the Sales Representative identified as capable of receiving payments in
U.S. dollars.

79.    On or about October 7, 2022, AKBARI emailed the Sales Representative
and said he canceled the old payment and sent another one.    The email included attachments
detailing payment instruction confirmation from a foreign exchange company indicating that on
October 7, 2022, a payment of $34,433.00 would be sent from Front Company-2 to Company-
6's account.

80.    Following apparent issues in receiving the payment, on or about October
21, 2022, AKBARI wrote to the Sales Representative, "I send the money again in a different
way.    I hope you received the money and confirm for next time transferring RMB is most
easier."    The email included an attachment reflecting a single customer credit transfer in which a
company based in Turkey sent a payment of $34,403.00 on October 21, 2022 to Company-6's
account.    On or about October 23, 2022, the Sales Representative asked whether the money had
been sent from Turkey, and two days later, he confirmed receipt of payment.

81.    On or about October 25, 2022, the Sales Representative advised AKBARI
that his company had booked a ship for nonstop transportation to "ABBAS," which I assess to be
Bandar Abbas, Iran.

82.    In or around late 2023, AKBARI possessed an invoice dated October 9,
2023, from Company-6 that included Company-6's U.S. dollar account the Sales Representative
had provided.    The pro forma invoice listed RAH ROSHD as the buyer and AKBARI's spoofed
email address associated with Company-2 as his contact information, for 70 masts to be shipped

to "ABBAS," a reference to Bandar Abbas, Iran.   The document also referenced the quotation the Sales Representative had provided in June 2022 for the purchase of pneumatic masts. Therefore, I assess that the invoice AKBARI possessed was for the defendants' purchase of pneumatic telescopic masts from the Sales Representative.   The total cost for the item and shipping was listed as $78,350.00.   Due to an advance payment of $23,000.00, the total balance listed was $55,350.00.

83.    On or about October 17, 2023, AKBARI sent the Sales Representative a message with an attachment providing details of a payment of $23,000.00 that had been sent on October 15, 2023, to Company-6's bank account.   Based on the above correspondence and my involvement with the investigation, I believe the payment of $23,000.00 was made to Company-6's bank account as an advance payment related to the sale of 70 masts from Company-6.

84.    On or about October 24, 2023, AKBARI possessed a document confirming a sale, dated October 15, 2023, listing Front Company-2 as the buyer of 70 pieces of masts from Company-6, to be shipped from Shanghai, China, to Dubai, United Arab Emirates.

85.    On or about October 26, 2023, the Sales Representative advised AKBARI that they had received AKBARI's payment and had asked his company's factory to produce "these masts."

86.    On or about December 10, 2023, AKBARI and the Sales Representative discussed the shipping logistics related to the delivery of the masts.   AKBARI advised the Sales Representative, "you can use any forwarder but they should do the switch bill[,] that means the main port is Bandarabbas[.] [M]eanwhile: I ordered to transfer money from the same company in Dubai."   The Sales Representative confirmed to AKBARI that the goods would be sent to Abbas, meaning Bandar Abbas, Iran.

87.     On or about December 13, 2023, AKBARI possessed a document reflecting acknowledgment of payment, made on or about December 13, 2023, of $55,350.00 from Front Company-2 to Company-6.   According to the document, that payment had been sent from a bank located in the United Arab Emirates; it further reflected that the payment related to the quotation the Sales Representative had previously prepared for 70 pieces of masts.   In addition, AKBARI possessed another document reflecting acknowledgment of payment, made on or about October 14, 2023, of $23,000.00 from Front Company-2 to Company-6, sent from another bank located in the United Arab Emirates that referenced the same quotation for the order of masts.

88.     On or about December 28, 2023, the Sales Representative responded to a message from AKBARI to resolve an issue involving a "client" and stated, "Recent years I do not export to Iran or Dubai except you."   On or about June 5, 2024, AKBARI wrote to the Sales Representative regarding an issue, "How did you manage to destroy the market that we created in Iran after 15 years of efforts with one request" and later wrote "be careful. You and I worked hard for this market. Let's not let it be ruined by one purchase in one day."

89.     As noted above, I have reviewed an open-source video, in which IRGC officials showcased the Mohajer-6 drone, which was labeled with the IRGC logo.   In the video, the IRGC used a truck labeled with the IRGC's logo which appeared to facilitate communications with the Mohajer-6 drone using a pneumatic mast.   As noted above, the RAH ROSHD Brochure confirmed that the defendants provided pneumatic masts to QAI, which manufactured the Mohajer-6 drone.   And as discussed above, the defendants procured pneumatic masts via a company based in China.   Thus, there is probable cause to believe that

the defendants procured pneumatic masts for their clients, QAI and the IRGC, to ultimately benefit the IRGC.

C.    The Defendants' Efforts to Procure Parts for Drones for the IRGC's Benefit

90.    Emails sent and received by the defendants AMIDI and AKBARI confirm their scheme to assist the IRGC by producing and manufacturing parts for drones.    For example, on or about December 21, 2021, a sales representative from a battery manufacturer based in China emailed AKBARI in response to an inquiry AKBARI made to purchase lithium batteries. The sales representative asked AKBARI "what product will these batteries be use for?" AKBARI, using his spoofed email address associated with Company-2, responded, "on a drone." AKBARI obtained a price quotation from the sales representative, which he then forwarded to AMIDI.

91.    Likewise, on or about February 22, 2022, AKBARI, using his spoofed email address associated with Company-2 and the alias "Danial White," received an email from representatives at a Chinese company regarding purchasing an "ip mesh."    AKBARI responded, "They want a system that puts a system on top of a hill and several systems on a car in the desert at a distance of 50 km.    All cars have audio and video communication with each other and the center."    AKBARI later noted, "[T]hey need it for drone," and attached several pictures of drones, including the pictures below.    Based on my training and experience, and my participation in the investigation, I understand that AKBARI was attempting to purchase a system that would allow UAVs to communicate with one another and with a ground control center.    I further believe that AKBARI's use of "they" referred to RAH ROSHD clients.    As noted above, RAH ROSHD's clients include the IRGC.





D.    The Defendants' Efforts to Procure Company-7 Engines for the Benefit of the IRGC

92.    Similarly, the investigation to date, including the defendants' emails and messages, reflected that they were procuring engines manufactured by a European company ("Company-7"), which were also found in the Mohajer-6 drone, for the benefit of the IRGC. For example, on or about March 29, 2020, AMIDI possessed an Excel sheet labeled "[Company-7] Spare Parts.xlsx" that listed several items manufactured by Company-7, including a particular engine model (the "Company-7 Engine").   The list included a column for quantity with respective numbers for each item; the Company-7 Engine included a quantity of four, indicating that AMIDI intended to procure or had procured four Company-7 Engines.

93.    On or about January 1, 2021, AMIDI sent a letter to an unknown recipient on letterhead for Company-3.   The letter included an invoice purportedly from Company-3

regarding the sale of 10 Company-7 Engines for a total price of approximately €340,000.00.
Based on my training and experience and my involvement with the investigation, I believe the
defendants used Company-3's letterhead to obfuscate RAH ROSHD's involvement in procuring
engines manufactured by Company-7.   On or about January 18, 2021, AMIDI possessed a RAH
ROSHD brochure that provided details on the Company-7 Engine Management Unit, which
described the unit as a state-of-the-art engine management unit for the Company-7 Engine.
Based on my review of these documents and the investigation to date, I believe RAH ROSHD
was advertising its ability to obtain Company-7 Engines for the benefit of its clients, including
the IRGC.

94.    On or about May 3, 2021, AMIDI sent a letter on letterhead for Company-
3 to an unknown recipient, requesting a quotation for five Company-7 Engines.   Based on my
review of this document and the investigation to date, I believe AMIDI used Company-3
letterhead to obfuscate the defendants' procurement of Company-7 Engines on behalf of RAH
ROSHD.

95.    On or about July 8, 2023, AKBARI, using the spoofed email address
associated with Company-2 and using the alias "Danial White," emailed regarding an inquiry for
a Company-7 Engine and confirmed that he had previously purchased 75 Company-7 Engines.
On or about July 8, 2024, AKBARI emailed the same account regarding the procurement of
Company-7 Engines.

96.    As noted above, in or around and between November 2020 and June 2021,
AMIDI forwarded a document named "UAV Parts List," which contained a "LIST OF UAV
SUBSYSTEMS."   That document listed "engine and engine spare parts" manufactured by
Company-7.   Based on my training and experience and my involvement in this investigation, I

believe RAH ROSHD was procuring Company-7 Engines and engine parts for UAVs on behalf of its clients, including the IRGC.

97.    As noted above, the Mohajer-6 drone recovered by the Ukrainian Air Force included electronic components and parts manufactured by U.S. and Western companies. Among the parts found was the Company-7 Engine.   As discussed above, the IRGC has advertised its operation of the Mohajer-6 drone.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants HOSSEIN AKBARI, also known as "Danial Yousef" and "Danial White," and REZA AMIDI, also known as "Ali Rahmani," and a summons be issued for defendant RAH ROSHD COMPANY, so that they may be dealt with according to law.

_Colin Jacobsen_
_____
COLIN JACOBSEN
Special Agent, Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable telephonic and electronic means
pursuant to Federal Rule of Criminal Procedure 4.1, this
31st day of March, 2025

_James R. Cho_
_____
THE HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK